UNITED STATES DISTRICT COURT
DISTRICT OF CONNECTICUT

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | : | CRIMINAL NO: 3:02CR5(JBA) |
| | : | |
| v. | : | |
| | : | |
| STEVEN CHEN and GONG CHAI SUN | : | SEPTEMBER 29, 2006 |

**GOVERNMENT'S MEMORANDUM IN AID OF POST-*CROSBY* PROCEEDINGS
ON REMAND WITH RESPECT TO THE DEFENDANT STEVEN CHEN**

The Government respectfully submits this memorandum in response to the Court's Order dated August 25, 2006, inviting written submissions from the parties on whether the Court would have imposed a non-trivially different sentence on defendant Steven Chen if the Sentencing Guidelines had been advisory; and otherwise in aid of proceedings on remand from the United States Court of Appeals for the Second Circuit.

**I.    Procedural Background**

Between January 1999 and December 2001, Steven Chen ("Chen") and Gong Chai Sun ("Sun") ran a significant loan-sharking enterprise out of the Foxwoods Casino in Connecticut, through which they charged mostly Asian borrowers exorbitant interest rates on loans, and then threatened physical or economic harm when the money was not paid back on time.

Chen and Sun loaned out money to Asian patrons at the casino under the following terms: the defendants would collect ten percent immediately from the principal loaned, and seventy-two hours later the entire principal was due back. If the money was not repaid, the defendants charged ten percent interest every week.

On January 8, 2002, a federal grand jury returned a three-count indictment against Chen Sun, charging them with conspiracy to collect and attempt to collect extensions of credit by

extortionate means, as well as two substantive counts of collecting and attempting to collect extensions of credit by extortionate means, in violation of 18 U.S.C. § 894(a). Specifically, Count One charged that Chen and Sun conspired to participate in the use of extortionate means to collect and attempt to collect outstanding loans from victims Inguan Teoh ("Teoh"), Chen Shen Hsu ("Hsu") and others whose identities were unknown to the Grand Jury, and to punish those debtors for non-payment of the loans, by using and threatening to use violence or other criminal means to harm the debtors. Count Two charged both defendants with a substantive offense of using extortionate means to collect and attempt to collect principal and interest from Teoh, and Count Three charged both defendants with similar conduct concerning victim debtor Hsu.

Both defendants pleaded not guilty and were tried before a jury from August 26 through August 30, 2002.

During the trial, the jury saw videotapes of Chen and Sun on the floor of the Foxwoods Casino, and observed Sun giving a loan to a gambler and receiving collateral, while Ah-Qiang, their enforcer, stood over the debtor. The jury also saw and heard consensually videotaped meetings in a hotel room at Foxwoods Casino between a cooperating witness – Kun "Tony" Lin – and the defendants Sun and Chen. During those conversations, both Sun and Chen admitted to being involved in the loan-sharking operation and discussed the maintenance of records, the collection process, and their claim that they would use police to collect the debts.

The jury also heard from Inguan Teoh and Chin Shen Hsu, two of the victims of the loan-sharking operation, who both admitted to receiving multiple loans during the time set forth in the Indictment, and discussed the threats and fear they experienced in the collection of those loans.

In short, the evidence at trial showed that the defendants were involved in a large-scale loan-sharking enterprise that operated out of the Foxwoods Casino in Connecticut, through which they charged mostly Asian borrowers exorbitant interest rates on loans. The evidence demonstrated that threats of force were used to induce payment on those loans, including, among other things: statements to debtors that the defendants and their associates had the means and the manpower to track debtors down and force them to repay; statements to debtors threatening to blow up or shut down their restaurants if they did not pay; and the use of aggressive body language and hovering over debtors as they gambled in an effort to intimidate them.

At the close of the government's case and again following the close of evidence, the defendants orally moved for a judgment of acquittal or, in the alternative, a new trial. The Court reserved decision pending the jury's deliberations.

On August 30, 2002, the jury convicted Chen on all three counts, and convicted Sun on the first and second counts, acquitting him on the third count. Following the verdict, Chen and Sun renewed their oral motions for judgments of acquittal or a new trial, which were followed by written submissions of the parties.

On December 3, 2002, with post-trial motions pending and further briefing anticipated, the Court sentenced Chen to 57 months of imprisonment and three years of supervised release. That day, the Court also sentenced Sun to 33 months of imprisonment and three years of supervised release. Chen filed his notice of appeal on December 3, 2002, and Sun filed his notice of appeal on December 12, 2002.

On September 2, 2003, in a written decision following extensive briefing and oral argument, the district court denied the defendants' post-trial motions in their entirety.

On August 14, 2003, the defendant Gong Chai Sun completed his term of incarceration with the Federal Bureau of Prisons.

On August 5, 2004, the Second Circuit Court of Appeals, in a published opinion, denied the defendants' various claims on appeal and affirmed their convictions.  See United States v. Steven Chen and Gong Chai Sun, 378 F.3d 151 (2d Cir. 2004).  The Court of Appeals, however, withheld its mandate, in anticipation of further guidance from the Supreme Court following the issues raised by that Court's decision in Blakely v. Washington, 542 U.S. 296 (2004).  On November 22, 2004, the Supreme Court denied appellant Steven Chen's application for a writ of certiorari.  See Chen v. United States, 543 U.S. 994 (November 22, 2004).

On February 4, 2005, following the Supreme Court's subsequent decision in United States v. Booker/Fanfan, 543 U.S. 220 (2005), and the Court of Appeals' decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005), the Second Circuit issued a standard order in the Chen/Sun appeal (one of various so-called "held cases"), in which the Circuit Court indicated that the procedures to be followed in such "held cases" were set forth in the Crosby opinion.  The Court of Appeals' Order, however, stated that "we will not follow the procedure outlined in Crosby if, in a particular case, no appellant seeks resentencing."  To that end, the Order directed counsel for the appellants to indicate whether they intended to pursue a resentencing by "answering [a] question on [an] attached form (and [to] fill in the blanks for the case name, docket number(s), attorneys, and the date of oral argument or submission), and promptly fax the completed form to the Clerk of the Court at (212) 857-8710 or mail it to the Clerk of the Court, United States Court of Appeals for the Second Circuit, 40 Foley Square, New York, NY 10007."

On or about February 22, 2005, counsel for defendant Steven Chen submitted a letter in response to the Second Circuit's Order, stating his intention to pursue proceedings in conformity with Crosby. It appears that no response was ever made by, or on behalf of, the defendant Gong Chai Sun.[1]

On April 28, 2005, the United States Court of Appeals for the Second Circuit ordered a limited remand in this case, for further proceedings in conformity with the Supreme Court's decision in United States v. Booker/Fanfan, 543 U.S. 220 (2005), and the Court of Appeals' decision in United States v. Crosby, 397 F.3d 103 (2d Cir. 2005).

On May 3, 2006, the defendant Steven Chen completed his term of incarceration with the Federal Bureau of Prisons.

On August 25, 2006, this Court issued an Order inviting simultaneous briefing from the government and from counsel for the defendant Steven Chen in aid of *Crosby* proceedings on remand from the United States Court of Appeals for the Second Circuit. The instant memorandum is the Government's submission in that regard.

---

[1] Pursuant to the Court's request during the August 25, 2006 conference call between government counsel and counsel for the defendant Steven Chen, counsel for the government, out of an abundance of caution, made an inquiry that same date by phone and fax-confirmed letter to counsel for the defendant Gong Chai Sun. The purpose of the inquiry was to confirm whether Gong Chai Sun had any intentions to pursue *Crosby* proceedings or whether the opportunity to pursue any such proceedings were moot, particularly given that Gong Chai Sun had long since completed his term of incarceration with the Bureau of Prisons on or about August 14, 2003 (nearly a year before the Second Circuit's decision on his appeal dated August 5, 2004); and given that Mr. Sun did not submit anything in response to the Court of Appeals' subsequent order of February 5, 2005, asking him to complete a short form indicating that he intended to pursue a resentencing pursuant to *Crosby*, as Mr. Chen did. As of this writing, the government has not received any response to its inquiries. In connection with efforts to assist counsel in ascertaining the current whereabouts of Chen and Sun, however, undersigned counsel had occasion to speak with the former case agent, FBI Special Agent Peter Hsieh. With respect to Gong Chai Sun, Agent Hsieh recalled a conversation he had upon bumping into Attorney Hillis more than a year ago, in which Attorney Hillis advised that his former client, Gong Chai Sun, had successfully prevailed in deportation proceedings and, to his knowledge, had remained in the United States and was living somewhere in California. To date, however, the government has been unable to confirm Sun's whereabouts or confirm the belief that he has had, and continues to have, no intention to pursue *Crosby* proceedings.

## II.   Purpose of *Crosby* Remand

As the Court is no doubt well aware, in Booker, the Supreme Court held that the United States Sentencing Guidelines, as written, violate the Sixth Amendment principles articulated in Blakely v. Washington, 542 U.S. 296 (2004). As a remedy, the Court severed and excised the statutory provision making the Guidelines mandatory, 18 U.S.C. §3553(b)(1), thus declaring the Guidelines "effectively advisory." Booker, 543 U.S. at 245. This ruling results in a system in which the sentencing court, while required to consider the Guidelines, may impose a sentence within the statutory maximum penalty for the offense of conviction. The sentence will be subject to appellate review for "reasonableness." Id. at 260-64.

In Crosby, the Court of Appeals determined that it would remand most pending or "held" appeals implicating challenges to sentences imposed prior to Booker "not for the purpose of a required resentencing, but only for the more limited purpose of permitting the sentencing judge to determine *whether* to resentence, now fully informed of the new sentencing regime, and if so, to resentence." Crosby, 397 F.3d at 117. In this respect, the Court of Appeals explained that a remand would be necessary to learn "whether a sentencing judge would have imposed a materially different sentence, *under the circumstances existing at the time of the original sentence*, if the judge had discharged his or her obligations under the post-Booker/Fanfan regime and counsel had availed themselves of their new opportunities to present relevant considerations." Id. (emphasis added).

This statement of the purpose for Crosby remands makes clear that certain issues are simply irrelevant to this Court's determination whether to re-sentence. Specifically, because this

Court must determine whether to re-sentence based on "the circumstances existing at the time of the original sentence," id., arguments relating to post-sentencing factors are irrelevant. In short, the court must determine whether it would have imposed a non-trivially different sentence if the Sentencing Guidelines had been advisory at the time of the original sentence, and under the circumstances existing at the time of the original sentence.

**III.    There is No Compelling Reason to Re-Sentence in this Case Because the Court Carefully Considered All of the Relevant Sentencing Considerations at the Time of Sentencing; Exercised its Discretion in Denying a Leader / Organizer Role Enhancement for Mr. Chen; Declined to Downwardly Depart; and Clearly Expressed a View that the Resulting Sentence was Appropriate.**

Sentencing in the post-Booker regime, as explained in Crosby, now involves two analytic stages: first, a determination of the applicable Guidelines range (including any departures); and second, a determination of whether in light of the Guidelines and the other factors listed in 18 U.S.C. §3553(a), there is any reason to impose a non-Guidelines sentence. Crosby, 397 F.3d at 113. A review of the record in this case demonstrates that the Court already engaged in such an analysis and indeed, the record strongly suggests, insofar as the Court exercised its discretion in denying a role enhancement and in declining to downwardly depart at the initial sentencing, that there is no reason to hold a *Crosby* resentencing, as there is no indication that the Court would have imposed a non-trivially different sentence on defendant Steven Chen if the Sentencing Guidelines had been advisory.

Specifically, during the course of the sentencing hearing conducted in this case, the Court first noted that, setting aside departure claims, the only factual dispute that had any bearing on Chen's sentencing and required resolution by the Court was whether Chen qualified for a role

7

enhancement. See Sentencing Transcript, 12/3/2002 at 6. Counsel for the defendant Chen agreed. Id. The Court determined the applicable offense level, subject to the issue of Chen's role, as follows:

> The base offense level under 2E2.1 for conspiracy is level 20. There is now agreement that the two substantive counts, one of the two substantive []counts can be grouped with the conspiracy . . . . That the effect of the three convictions on the three counts is a grouping, giving rise to two units, that is, and offense level 22. There is no adjustment for victim, for acceptance of responsibility, for obstruction of justice, and the dispute, which will be the centerpiece of this hearing, will be whether there is sufficient evidence for a role enhancement under 3B1.1(a), as urged by the government and recommended by the probation office.

See Sentencing Transcript, 12/3/2002 at 8-9.

After pinning down the grounds for departure that counsel for Chen would later advance, see Sentencing Transcript, 12/3/2002 at 9-10, the Court proceeded to hear extensive argument regarding whether Chen was a leader or organizer of the loan-sharking venture and whether Chen's offense level should therefore be increased by four levels. See Sentencing Transcript, 12/3/2002 at 33-55. During the course of that argument the Court voiced concern about the sufficiency of the evidence in support of Chen's qualifying as a leader or organizer of the criminal venture under the Guidelines, but ultimately asked defense counsel why that same evidence would not make Chen a manager or supervisor, subjecting him to a three rather than a four point enhancement. See Sentencing Transcript, 12/3/2002 at 52 ("While I realize that the government and the probation officer have recommended the four-level increase for organizer / leader, why doesn't that evidence support a manager / supervisor?"). After consultation with his client, counsel for the defendant Chen conceded that the manager / supervisor enhancement applied. See Sentencing Transcript, 12/3/2002 at 53 ("Judge, I'm not going to argue with you

about that. I think that may be right."). Accordingly, there was agreement that Chen qualified for a manager or supervisor role enhancement of three points and the only issue that remained for resolution by the Court on the applicable range was whether Chen would receive an additional fourth point for role.[2]

The Court then proceeded to hear argument on various downward departures advocated by Chen – namely: (1) that the level of violence involved took the instant case outside the heartland of the typical case involving collecting extensions of credit by extortionate means; (2) that Chen's extraordinary family ties and responsibilities warranted a departure; (3) that Chen would suffer harsher conditions of confinement by virtue of his speaking only Chinese and in light of his likely deportation upon completion of his sentence; and (4) that a combination of such considerations warranted a departure. See Sentencing Transcript, 12/3/2002 at 9-10; 68-75.

At the conclusion of argument, the Court decided to take a short recess. See Setencing Transcript, 12/3/2002 at 97. Upon its return, the Court declined to award a fourth point for role and declined to exercise its discretion to grant a departure. See Sentencing Transcript, 12/3/2002 at 98-102.

First, with respect to the determination whether the government had sufficiently met its burden of establishing Chen as an organizer or leader, such that Chen qualified for a four-point enhancement, the Court found:

> There were five or more participants in the criminal activity, namely, Mr. Chen, Mr. Sun, Mr. Ah-Wu, Lao Hu, Ah-Fong, Su-Mei, Ah-Qiang. The Court finds that there is discrepant evidence with respect to the nature and degree of Mr. Chen's control,

---

[2] There was no dispute that Chen's Criminal History Category was I.

> direction and planning of the extortionate activities for which he stands convicted in the conspiracy. Undoubtedly the lack of clarity arises from the fact that it's a small operation in which the autonomy of [its] members and [its] circumstances is either equivocal or vague, but is insufficient to give the Court a basis for appropriately finding a leader or organization role enhancement of four, particularly in light of Mr. Sun's acknowledgment to Agent Hsieh where he had every incentive to give up Mr. Chen, [but during which he] denied that in fact Mr. Chen was the leader, the top dog. That is corroborated by the indications that this organization had a certain amount of autonomy as to its members and a certain amount of hierarchy, but the dimensions of Mr. Chen's control and authority over others, [the] degree of discretion is insufficient to support the leader / organizer enhancement, that is, Chen's role in organizing the people engaged in separate activities into an orderly operation described elsewhere in the case law as a magnet is insufficient.

See Sentencing Transcript, 12/3/2002 at 98-99. The Court went on to find, however, that Chen's conduct qualified him for a role enhancement as a manager or supervisor of a criminal activity that involved five or more participants or was otherwise extensive:

> However, [Chen's] role as a supervisor or manager who could, would and did back up his threats by sending out an enforcer such as Ah-Qiang is quite evident. The evidence that he directed the actions of others, that there were lower ranked people, by Mr. Sun's statement, Ah-Qiang and Ah-Fong, that the defendant made threats to send enforcers, had the authority and capacity to do so, and did so at least with respect to Ah-Qiang and Mr. Teoh, is sufficient evidence that Mr. Chen had direct control over others who were involved, although the full extent and degree of that authority and that discretion is, as I previously concluded, equivocal.
>
> It is also clear he had a managerial level role in encouraging new investors such as Kun Lin and in managing the partnership's operations and practices with respect to bookkeeping, collateral, etcetera, as evidenced in part in the taped conversation with Mr. Chen and Mr. Kun Lin. It's clear, as Mr. Donovan says, this is not a John Gotti type operation, but it is clear to the Court that the evidence demonstrates a manager / supervisor enhancement of three levels is appropriate, is proper and counsel has properly conceded as much.

See Sentencing Transcript, 12/3/2002 at 99-100. The Court therefore rejected the government's

and the probation office's recommendation of a four point role enhancement and concluded that

a three level enhancement for Chen's managerial or supervisory role in the offense applied; resulting in a total offense level of 25, which, with a criminal history category of I, resulted in an imprisonment range of 57 to 71 months. See Sentencing Transcript, 12/3/2002 at 100.

The Court then declined to exercise its discretion to grant the defendant Chen a downward departure. The Court stated:

> With respect to the departures, the position that the threats of violence with respect to victims' homes, restaurants and even persons as not being within the heartland of the contemplation of the crime of collecting extensions of credit by extortion seems to me unfounded. It is true that there is no evidence of actual violence. There does not have to be. The testimony of the victims certainly indicated there were credible threats of violence, and that is to my way of thinking precisely what is meant by the crime of – the substantive crime of Counts Two and Three and the conspiracy incorporating those substantive counts.

> With respect to family responsibility, the presentence report indicates, and it was reiterated here today, that Mr. Chen's son's mother works two jobs, barely supports the child, but does so thus far. This is, again, the incredibly sad reality that a defendant's crimes often hurts the peope he loves the most. I do find, particularly in light [of] 5H1.6, therefore that the ties and responsibilities, while very real, are not extraordinary and would be the situation of anyone facing incarceration and ultimately deportation. Difficult, yes; extraordinary, no.

> With respect to the harsh conditions in prison, I have no doubt that the loneliness and the inability to fully understand what the daily life's requirements are will be difficult. I have no doubt that the other factors that adhere because Mr. Chen is a deportable alien will also make his term of imprisonment more difficult than it would otherwise have been were he a citizen, but it does not seem to me that this is a situation other than that which is faced by a non-English speaking deportable alien, and thus the Court does not find that as a basis that was not – of a kind or degree that was not adequately considered by the Sentencing Commission warranting a departure.

See Sentencing Transcript, 12/3/2002 at 101-02. The Court then proceeded to impose a sentence at the low end of the applicable Guidelines range – namely, a term of 57 months.

While doing so, however, the Court made it quite clear that its findings, and ultimately, the 57-month sentence that it imposed, were entirely appropriate for this defendant. While declining to depart, the Court remarked:

> Having found each of the grounds not to support a departure, I also do not find that the totality of the circumstances supports a departure as representing circumstances of a degree or kind not adequately considered. What I do find is the sad reality that unlawful conduct hurts everyone around the defendant and derails a talented, able defendant's life opportunities. Reflecting, however, on the factors raised as a grounds for departure, the Court takes those under advisement for where in the imprisonment range of 57 to 71 months sentence should be imposed.

See Sentencing Transcript, 12/3/2002 at 101-02. Similarly, after imposing its sentence of 57 months, the Court commented:

> Mr. Chen sadly feels at this moment that his life is in ruins. We have an image from Greek mythology of a Phoenix, a bird, who arises from the ashes of a completely burnt out situation to be something new and even beautiful, and so I urge Mr. Chen to think that a life still with much to be lived cannot yet be said to have been in ruins.
>
> China is a country of enormous and increasing opportunity. It needs people with talent and perhaps chastened by this experience, people of integrity who understand the critical component of a functioning society, and that is lawful behavior of its citizens. The shame that I understand, particularly from your culture, you feel with great heaviness is remedied by the good deeds and the good examples hereafter. Whether it is completely remedied may not be. It is reduced at least by the pride that you and your family will take in your achievements hereafter.

See Sentencing Transcript, 12/3/2002 at 102-03.

In short, a review of the sentencing record in this case indicates: (1) that the Court carefully considered all of the relevant sentencing considerations at the time of the initial sentencing; (2) that the Court exercised its discretion in denying a leader / organizer role enhancement, which resulted in a lower Guideline range than recommended by the government

and Probation; (3) that the Court declined to further exercise its discretion and depart; and (4) that the Court ultimately imposed a sentence at the low end of what it found to be the appropriate sentencing range.  Perhaps more importantly, the record from the sentencing hearing is entirely devoid of any comment or suggestion by the Court that it was somehow constrained by the Guidelines, or that it would have reached different conclusions or arrived at a different sentence if the Court were not constrained by the then-mandatory nature of the Sentencing Guidelines.  To the contrary, the Court's findings on role, the exercise of its discretion in declining to award a downward departure; and the Court's comments upon imposing sentence, see Sentencing Transcript, 12/3/2002 at 101-03, all suggest that the Court thoroughly considered all of the appropriate sentencing considerations and arrived at what it believed to be an appropriate sentence.

    Accordingly, there does not appear to be any suggestion in the record that the Court "would have imposed a materially different sentence, under the circumstances existing at the time of the original sentence, if the [Court] had discharged [its] obligations under the post-Booker/Fanfan regime and counsel had availed themselves of their new opportunities to present relevant considerations."  Crosby, 397 F.3d at 117.

## IV. Conclusion

For the foregoing reasons, the government respectfully submits that, in conformity with the procedures outlined in Crosby, this Court should indicate, for the record, that upon review of the record and after consideration of the defendant's Guidelines range and all of the factors listed in 18 U.S.C. § 3553(a), there is no need for the defendant to be re-sentenced.

Respectfully submitted,

KEVIN J. O'CONNOR
UNITED STATES ATTORNEY


STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY
FEDERAL BAR NO. CT19105
UNITED STATES ATTORNEY'S OFFICE
915 LAFAYETTE BOULEVARD
BRIDGEPORT, CT 06604
(203) 696-3000
(203) 579-5575 (fax)
Stephen.Reynolds@usdoj.gov

**CERTIFICATE OF SERVICE**

    This is to certify that a copy of the foregoing was forwarded by mail this 29th day of September 2006 to:

| | |
|---|---|
| Jeremiah Donovan, Esq. | Michael S. Hillis, Esq. |
| Post Office Box 554 | Dombroski, Knapsack & Hillis |
| Old Saybrook, Connecticut 06475 | 129 Whitney Avenue |
| | New Haven, CT 06510 |

    This is also to certify that a courtesy copy of the foregoing was forwarded by mail this 29th day of September 2006 to:

Joe Montesi
United States Probation Officer
U.S. Probation Office
157 Church Street
New Haven, Connecticut 06510

_____
STEPHEN B. REYNOLDS
ASSISTANT UNITED STATES ATTORNEY